## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

JOAN MAYHEW-MORRELL,

     Plaintiff,

Case No. 17-10668

v.

HON. _____
United States District Judge

PRUDENTIAL INSURANCE,
COMPANY OF AMERICA,

     Defendant.

HON. _____
Magistrate Judge

_____

## **COMPLAINT**

## NATURE OF ACTION

1. This is an action brought pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B), to recover accidental death benefits owed under the terms of a group insurance policy issued by Prudential Insurance Company of America.

## PARTIES

2. Plaintiff Joan Mayhew-Morrell (hereinafter "Ms. Mayhew-Morrell") is a resident of Macomb County, Michigan.

3. Defendant Prudential Insurance Company of America (hereinafter "Prudential") is a New Jersey insurance company that regularly does business throughout Michigan, including Macomb County.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1) and 28 § U.S.C. § 1331.

5. Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b).

## Count I: Claim for Accidental Death Insurance Benefits

6. ERISA authorizes plan participants and beneficiaries such as Ms. Mayhew-Morrell to enforce their rights to benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).

7. Ms. Mayhew-Morrell's husband, Jeffrey Morell (hereinafter "Mr. Morrell"), died as a result of an accidental prescription drug overdose on May 26, 2013, five days after undergoing knee replacement surgery.

8. At the time of his death, Mr. Morrell was covered by a group policy of accidental death and dismemberment (AD&D) insurance issued by Prudential to Ms. Mayhew-Morrell's employer, Ascension Health.

9. Ms. Mayhew-Morrell is Mr. Morrell's beneficiary under the Prudential AD&D coverage, and Ms. Mayhew-Morrell timely made a claim for benefits to Prudential.

10. Prudential is a fiduciary under ERISA and has a duty to administer its AD&D policy solely in the interest of Prudential's insureds and their beneficiaries. 29 U.S.C. § 1104(a)(1).

11. In the course of investigating the claim, Prudential obtained copies of the autopsy report and medical records of Mr. Morrell.

12. The autopsy report obtained by Prudential was prepared by the Macomb County Medical Examiner, Dr. Daniel Spitz, and it confirmed that the cause of Mr. Morrell′s death was ″intoxication by the combined effects of multiple prescription medications.″

13. The autopsy report prepared by Dr. Spitz also confirmed that the manner of Mr. Morrell′s death was ″accident.″

14. A Prudential claim processor also submitted the autopsy and medical records for review by Prudential′s Vice President and Medical Director, Dr. Albert Kowalski.

15. The Prudential policy provides coverage for losses resulting from ″accidental bodily injury,″ and therefore, the Prudential claim processor first requested Dr. Kowalski′s opinion regarding whether Mr. Morrell sustained ″a bodily injury.″

16. In response, Dr. Kowalski confirmed that: ″In my opinion and with a reasonable degree of medical certainty, the records in the file do support that the insured sustained a bodily injury (Combined Effects of Multiple Prescription Medications).″

17. The Prudential policy provides that a loss is covered only if it "results directly from that injury and no other cause," and the Prudential claim processor requested Dr. Kowalski's opinion in this regard as well.

18. Dr. Kowalski responded that: "In my opinion and with a reasonable degree of medical certainty, the autopsy report and toxicology report do support that the insured's loss did result directly from that injury (Combined Effects of Multiple Prescription Medications) and from no other cause."

19. Consequently, subject to any policy exclusions, Mr. Morrell's death was a covered loss under the Prudential policy.

20. The Prudential claim processor requested Dr. Kowalski's opinion regarding one policy exclusion for: "Being legally intoxicated or under the influence of any narcotic unless administered or consumed as prescribed by a Doctor."

21. Dr. Kowalski then confirmed that the medications taken by Mr. Morrell "were prescribed by or consumed on the advice of a physician."

22. Consequently, the Prudential policy's intoxication exclusion does not apply to Mr. Morrell's death, and it actually affirms coverage of Mr. Morrell's death.

5

23. However, the Prudential claim processor also asked Dr. Kowalski about two "Sickness" exclusions under the Prudential policy, which exclude losses for:

   a. "Sickness, whether or not the Loss results directly or indirectly from the Sickness;" and

   b. "Medical or surgical treatment of Sickness, whether the Loss results directly or indirectly from the treatment."

24. These "Sickness" exclusions are complicated by the vague definitions of "Injury" and "Sickness" under the terms of the Prudential policy.

25. The Prudential policy defines "Sickness" as: "Sickness: Any disorder of the body or mind of a Covered Person, but not an Injury; pregnancy of a Covered Person, including abortion, miscarriage or childbirth.

26. Thus, to qualify as a "Sickness" under the Prudential policy, the afflicting disorder cannot have *any* "Injury" component.

27. The Prudential policy then defines "Injury" in the form of a tautology: "Injury: Injury to the body of a Covered Person."

28. Consequently, because Dr. Kowalksi has confirmed that Mr. Morrell′s drug overdose qualified as a ″bodily injury″ and that his death resulted ″from that injury and no other cause,″ this would seem to eliminate the ″Sickness″ exclusions under the terms of the Prudential policy.

29. But Dr. Kowalski initially found that both of the ″Sickness″ exclusions applied to Mr. Morrell′s death.

30. Without mentioning the knee replacement surgery, Dr. Kowalski opined that:

> As per the records in the file, the insured was prescribed Oxycodone (Narcotic Analgesic, Brand Name Percocet) for chronic pain related to Osteoarthritis (Knee & Spine) and Neuropathy. If not for the insured′s Osteoarthritis (Knee & Spine) and Neuropathy, the insured would not have been prescribed the Oxycodone and would not have died from the Combined Effects of Multiple Prescription Medications with Oxycodone being the most important medication.
>
> Therefore, in my opinion and with a reasonable degree of medical certainty, the insured′s did loss [sic] result indirectly from sickness (Chronic Pain due to Osteoarthritis (Knee & Spine) and Neuropathy).

31. Based on this indirect-treatment-of-Sickness exclusion, Prudential issued an initial denial of AD&D benefits on December 18, 2013, reiterating the analysis of Dr. Kowalski:

> Based on the above information this claim does not meet the group policy provision of a covered loss since Mr. Morrell′s death was indirectly from sickness (Chronic Pain due to

7

Neuropathy and Osteoarthritis of the Knee and Spine) and directly from medical treatment (Oxycodone) of sickness (Chronic Pain due to Neuropathy and Osteoarthritis of the Knee and Spine). If not for Mr. Morrell's Neuropathy and Osteoarthritis of the knee and spine, he would not have been prescribed the Oxycodone and would not have died from a combined effects of multiple medications. Therefore we are denying this claim for Accidental Death Benefits.

32. In effect, Prudential determined that an undisputed "Injury," purportedly resulted from the treatment of "Sickness," was therefore excluded from coverage even though the "Injury" was confirmed by Prudential's Medical Director to be the sole cause of Mr. Morrell's death, and "Sickness" is defined as "[a]ny disorder, but not Injury" under the terms of the Prudential policy.

33. This application of the general and vague "Sickness" exclusions also appears to render meaningless the more specific and particularized Prudential policy exclusion for "[b]eing legally intoxicated or under the influence of any narcotic unless administered or consumed as prescribed by a Doctor," which would leave coverage for Mr. Morrell's death intact.

8

34. Moreover, even under the convoluted approach taken by Prudential, the denial decision ignores the history of Mr. Morrell′s condition and the fact that his prescription drug overdose immediately followed knee replacement surgery to address pain from injuries that included a torn anterior cruciate ligament (ACL) and a torn meniscus.

35. Ms. Mayhew-Morrell appealed the Prudential denial on June 16, 2014.

36. Among other things, Ms. Mayhew-Morrell pointed out that, if treatment of pain with narcotics is considered to be treatment of ″Sickness,″ then death resulting from the use of narcotic medication would always be excluded from coverage, thereby contradicting the terms of the more specific intoxication exclusion that preserves coverage when the narcotics are ″administered or consumed as prescribed by a Doctor.″

37. Ms. Mayhew-Morrell also pointed out that Mr. Morrell was being treated with narcotics for pain from a documented injury that included a torn ACL and a torn meniscus.

38. On June 25, 2014, Prudential issued a letter indicating that it was ″reconsidering our denial of the claim for Accidental Death benefits,″ and Prudential began gathering additional information regarding the claim.

9

39. The records provided to Prudential clearly show Mr. Morrell′s treatment for injury to his right knee leading up to his May 26, 2013 death, including but not limited to:

   a. A ″History of Present Illness Form″ completed by Mr. Morrell on January 4, 2013 regarding his right knee pain included these responses to form questions:

      i. ″Was there an injury?″ ″Yes.″

      ii. ″When did the injury occur?″ ″Year ago.″

      iii. ″Where did it happen?″ ″Home.″

      iv. ″Explain what happened.″ ″Fell.″

   b. A January 8, 2013 MRI of Mr. Morrell′s right knee that showed:

      i. ″Complex tears of the body and posterior horn of medial meniscus with partial herniation of the medial meniscus body into the para-articular gutter;

      ii. ″[C]omplex tears of the anterior root of lateral meniscus;″ and

      iii. ″Interstitial type partial tear of the anterior cruciate ligament.″

   c. A January 18, 2013 chart note in which Mr. Morrell′s treating physician confirmed ″tears of the menisci ... in both the medial and lateral side″ and ″tears of the ACL.″

d.  A February 15, 2013 right knee arthroscopy confirming Mr. Morrell′s torn ACL and torn meniscus, and noting that the ACL tear was then debrided.

e.  A March 13, 2013 chart note indicating that Mr. Morrell was still in pain from the right knee but was trying to wean himself off of the Percocet.

f.  An April 8, 2013 chart note indicating that Mr. Morrell had ″stopped using Percocet.″

g.  An April 11, 2013 chart note indicating that Mr. Morrell′s right knee was progressing and he was considering replacement of the left knee.

h.  An April 25, 2013 chart note indicating that Mr. Morrell was having significant pain in his right knee and issuing a new prescription for Percocet.

i.  A May 2, 2013 chart note indicating that Mr. Morrell′s right knee pain had flared up to such an extent that the decision was to proceed with a right knee replacement first.

j.  A May 8, 2013 chart note documenting Mr. Morrell′s ″horrific pain″ with his right knee, and although concerned with Percocet use, planning to ″wean him off the medication entirely″ as soon as the right knee replacement was completed.

k.  A May 25, 2013 ″Home Health Certification and Plan of Care″ referencing Mr. Morrell′s May 21, 2013 right knee replacement surgery and planning to implement a new medication schedule within 1-2 weeks.

40. On August 8. 2014, the Prudential claim handler referred the file for additional review by Dr. Kowalski, asking specifically: ″Is it still your medical opinion that the documentation in file supports that the Oxycodone was, most likely, prescribed for chronic pain related to sickness (Osteoarthritis (Knee & Spine) and Neuropathy)?″

41. Dr. Kowalski changed his opinion in a August 26, 2014 response:

> I reviewed the additional medical records concerning the insured′s diagnoses of Right Torn Meniscus, ACL Tear and Right Knee Arthritis.  The Insured′s orthopedic problems of the right knee could have been from degenerative changes (sickness) or from injury.

42. Unable to continue basing its benefit denial on the opinion of Dr. Kowalski, who now recognized the fact that Mr. Morrell′s treatment could have been for ″injury,″ Prudential referred the claim to Reliable Review Services, which assigned the claim to Dr. William Andrews for a record review.

43. Dr. Andrews′ September 9, 2014 review report focused primarily on Mr. Morrell′s pre-2013 treatment for non-knee problems before mentioning that: ″The insured developed increasing pain in both knees and MRIs were obtained..″

44. Regarding the January 8, 2013 MRI of Mr. Morrell′s right knee, Dr. Andrews′ review report does not mention the meniscus tear, although it does acknowledge the ACL tear.

45. The only other reference in Dr. Andrews′ review report to treatment of Mr. Morrell′s right knee was: ″The insured underwent an arthroscopy by Dr. Mendelson and the right knee was significantly improved by the scope.″

46. Dr. Andrews′ review report reflects that he mistakenly thought that Mr. Morrell had a *left* knee replacement, not a *right* knee replacement, and that he believed the *right* knee problems were totally resolved by the February 15, 2013 arthroscopy.

47. Dr. Andrews even went so far as to say that there were ″no reports of significant postoperative problems from the knee replacement,″ apparently disassociating Mr. Morrell′s narcotic drug overdose and death from the knee replacement surgery.

48. Dr. Andrews argued that Mr. Morrell′s prescription drug use was primarily for other conditions, and only partially for ″arthroscopy of the right knee and replacement of the left knee (which occurred five days before the drug overdose).″

49. Dr. Andrews′ cursory opinion is severely undermined by the fact that he did not even know which knee was replaced and was not aware of the full history of right knee treatment and pain leading up to the surgery.

50. Nevertheless, apparently referring to an April 12, 2013 MRI of the left knee that showed a meniscal tear as well as arthritis and an ACL "strain," Dr. Andrews summarily concluded, that Mr. Morrell's condition appeared to be "chronic and not to be an acute injury," declaring: "These problems would be considered a sickness and not an injury."

51. Dr. Andrews argued that "a distant injury that slowly deteriorates over time" should be considered a sickness, not an injury.

52. On September 24, 2014, Prudential issued its denial of Ms. Mayhew-Morrell's first appeal, reiterating the obviously erroneous conclusion that Mr. Morrell was taking pain medication primarily for other conditions and only partially for "arthroscopy of the right knee and replacement of the left knee."

53. Prudential invited Ms. Mayhew-Morrell to submit a second appeal, and she did so on March 24, 2015.

54. During the appeal process, Ms. Mayhew-Morrell also requested an independent assessment by Dr. Bader Cassin, a well-respected forensic pathologist.

55. Dr. Cassin explained that a "distant injury" is still an "injury," and the records support the fact that Mr. Morrell's right knee ACL tear and meniscus tear were injuries: "The inability to recall or cite a 'specific injury' is irrelevant."

56. Also submitted during the appeal process were two peer-reviewed medical journal articles documenting that knee osteoarthritis frequently results from injury and trauma, although the specific injury incident cannot be recalled.

57. Consequently, it is actually quite likely in these circumstances that knee osteoarthritis is initially caused by injury that is not repaired, leading to deterioration, not by sickness.

58. As Dr. Cassin concluded:

> In consideration of our understanding that meniscal and ligamentous tears result from injury, and that surgery for these injuries was conducted to relieve their continued disabling effects, and that prescribed postoperative medications became overwhelming, Jeffrey Morrell's death resulted from a series of injuries and is appropriately certified as an accident.

59. In the course of processing this appeal, Prudential again referred the case to Reliable Review Services, which assigned the case to Dr. Vicki Kalen for a record review.

16

60. Dr. Kalen's November 18, 2015 record review focused primarily on Mr. Morrell's pre-2013 medical history, although unlike Dr. Andrews, Dr. Kalen did report correctly which knee had the replacement surgery on May 21, 2013.

61. Dr. Kalen argued that Mr. Morrell never reported an injury to his knee, apparently overlooking the January 4, 2013 report by Mr. Morrell that his right knee injury was the result of a fall at home about a "year ago."

62. Without discussing the scientific literature, Dr. Kalen summarily concluded that Mr. Morrell's right knee replacement was "done for degenerative disease, not traumatic meniscal or ACL tears."

63. On December 1, 2015, Prudential issued it final appeal denial, simply reiterating Dr. Kalen's conclusion that Mr. Morrell was taking his medication "primarily for degenerative disease processes, not injury."

64. Ms. Mayhew-Morrell has exhausted her administrative remedies, and her only remaining recourse is to proceed before this Court.

65. In the course of the administrative process, Prudential did not offer any type of analysis or interpretation of its policy language, such as the applicability of the specific intoxication exclusion or the definitions of "Sickness" or "Injury."

17

66. Prudential does not dispute that Mr. Morrell "sustained a bodily injury (Combined Effects of Multiple Prescription Medications)," or that Mr. Morrell's death "did result directly from that injury (Combined Effects of Multiple Prescription Medications) and from no other cause," as determined by Prudential Vice President and Medical Director Dr. Albert Kowalski.

67. Prudential's intoxication exclusion also does not apply because Dr. Kowalski confirmed that the medications taken by Mr. Morrell "were prescribed by or consumed on the advice of a physician."

68. Indeed, the affirmation of coverage contained in the Prudential policy's intoxication exclusion for death caused by narcotics prescribed by a physician establishes conclusively that Mr. Morrell's death is a covered loss.

69. Prudential's "Sickness" exclusions also do not apply because the definition of "Sickness" requires that there is no presence of "Injury" whatsoever, and Mr. Morrell's right knee condition clearly resulted from injury.

18

70. Therefore, it would be appropriate for the Court to award Ms. Mayhew-Morrell the benefits to which she is entitled under the terms of the Prudential policy and ERISA, 29 U.S.C. § 1132(a)(1)(B).

71. It would also be appropriate for the Court to award Ms. Mayhew-Morrell her costs and reasonable attorney fees incurred in this action pursuant to ERISA, 29 U.S.C. § 1132(g)(1).

## Request for Relief

Wherefore, pursuant to 29 U.S.C. § 1132, Plaintiff Joan Mayhew-Morrell requests this Honorable Court to enter judgment in her favor against Defendant Prudential Insurance Company of America for the full amount of accidental death insurance benefits owed, together with appropriate costs, interest, and statutory attorney fees.

Respectfully submitted,


s/Robert B. June
Robert B. June
Law Offices of Robert June, P.C.
Attorney for Plaintiff
415 Detroit Street, 2nd Floor
Ann Arbor, MI 48104-1117
Phone: (734) 481-1000
Primary E-Mail: bobjune@junelaw.com
Attorney Bar Number: P51149

Dated:  March 2, 2017

19